**United States District Court
Northern District of Alabama
Southern Division**

03 JUN -3 PM 2: 36

DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| Dennis Elliot, ] | |
| Plaintiff(s), ] | |
| vs. ] | CV-02-CO-0016-S |
| Wal-Mart Stores, Inc., ] | |
| Defendant(s). ] | |

ENTERED
JUN 0 3 2003

**Memorandum of Opinion**

## I. Introduction.

Presently before the court is a motion for summary judgment, filed by the defendant on January 31, 2003. [Doc. # 37.] The issues raised therein have been briefed by both parties and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion is due to be granted with respect to the plaintiff's claims brought under the Americans with Disabilities Act, as well as his claims for intentional and negligent infliction of emotional distress. Additionally, the plaintiff's claims brought under Alabama's worker's compensation law are due to be remanded to the Circuit Court of Walker County, Alabama.

## II. Facts.[1]

Plaintiff Dennis Elliot ("Mr. Elliot"), who was previously employed by defendant Wal-Mart Stores, Inc. ("Wal-Mart") from 1979 to 1988, was re-hired by Wal-Mart on April 20, 1998.

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



He was initially re-hired as a co-manager trainee in the Bessemer store, and eventually was promoted to the position of co-manager. Mr. Elliot worked as a co-manager at the Wal-Mart stores in Fayette and Sumiton, Alabama before being transferred to the store in Homewood, Alabama in or around September 2000. In his position as a co-manager, Mr. Elliot was subjected to periods of prolonged standing and walking on concrete floors.

On September 7, 2000, Mr. Elliot sustained an on-the-job injury to his left foot. According to Mr. Elliot, he was injured while descending a ladder in the stock room; he missed a step on the ladder and injured his ankle stepping down to the floor. He testified that he heard his ankle make a snapping sound, and he believed he had sprained his ankle. Mr. Elliot went to the lounge area to rest, where he informed John Carroll, a co-manager, and Thomas Quesar, the store manager, that he had been injured coming down a ladder. Mr. Elliot worked the remaining eight hours of his shift that day. Rather than returning to work the following day, he went to see Dr. Axelroth, a foot doctor in Jasper, Alabama. Dr. Axelroth x-rayed Mr. Elliot's foot, gave him a cortisone shot, wrapped his foot, and told him that he could not find any breaks in the foot, but recommended that Mr. Elliot limit his walking. Mr. Elliot returned to work the next day; however, on September 14, 2000, Mr. Elliot returned to Dr. Axelroth's office and received a note recommending that he stay off his feet until September 26, 2000. Mr. Elliot worked between September 26 and October 3, 2000.

On September 26, 2000, Mr. Elliot was seen by Dr. Vague, an orthopedic surgeon he found listed in the telephone book. Dr. Vague took a history of Mr. Elliot, who did not report the fall-from-the-ladder incident to Dr. Vague. Rather, Mr. Elliot reported that his job required him to walk approximately ten to twenty miles a day on a concrete floor. Upon

examination, Dr. Vague concluded that Mr Elliot had a cystic area over the dorsal aspect of his right foot, some mild pes plantus or flat-foot on his right foot, some spasticity of the tendons around his left heel, and a coalition in his left foot.[2] Dr. Vague saw Mr. Elliot again on October 3, 2000, at which time he ordered a bone scan of Mr. Elliot's left foot. That bone scan revealed increased uptake in the heal area, which Dr. Vague testified is consistent with a possible stress fracture, the condition with which he diagnosed Mr. Elliot. Dr. Vague prescribed the use of a foot brace at that time, although he never prescribed Mr. Elliot any medication for pain or other symptoms.

Mr. Elliot turned in a request for a medical leave of absence on October 10, 2000, and he was granted a leave of absence until October 31, 2000. During this leave of absence, there was no change in Mr. Elliot's benefits, and he was not demoted. Mr. Elliot returned to Dr. Vague on October 31, 2000, and was given a note indicating that he should stay off his feet for an additional three weeks. In his deposition, Dr. Vague opined that Mr. Elliot's symptoms could be further irritated by prolonged standing or walking on concrete. Further, he testified that the cause of Mr. Elliot's problems with his feet was prolonged standing on concrete.[3] However, Dr. Vague opined that Mr. Elliot would have reached maximum medical improvement by April 24, 2001, at the latest. Furthermore, Dr. Vague testified that Mr. Elliot was able to perform a number of jobs, including ones that involved walking up

---

[2] According to the deposition testimony of Dr. Vague, a coalition occurs where two bones are joined together where they should not be. (Vague Dep. at 15.)

[3] However, he had no knowledge of the injury Mr. Elliot received on September 7, 2000; it is unclear whether Dr. Vague might have considered the fall from the ladder to be a contributing factor to Mr. Elliot's symptoms had he been aware of that event.

to two miles a day, as well as sedentary or partially sedentary jobs. Mr. Elliot filed another request for a leave of absence on November 1, 2000, asking that he be permitted to take a leave from November 1, 2000, until November 22, 2000, by which time, according to Dr. Vague, his stress fracture would have been healed.

During his leave of absence, Mr. Elliot spent some time working at Elliot Motors, a used car dealership he owns. A Wal-Mart employee who lives near Mr. Elliot's home saw Mr. Elliot working in the used car lot during his leave of absence and notified David Johnson ("Mr. Johnson"), the district manager for the Birmingham area, that Mr. Elliot was conducting some business during his leave of absence. Wal-Mart proceeded to open an investigation into whether Mr. Elliot was working while on a leave of absence in violation of Wal-Mart's leave of absence policy, of which Mr. Elliot was aware, which states:

> Employment with another employer and/or starting or furthering a self-employment venture is prohibited while on leave of absence unless approved by a member of the Executive Committee. If it is believed an Associate is violating this provision, an investigation must be conducted and the Associate interviewed. If such investigation confirms a violation of this provision, the Associate's leave of absence and employment may be terminated and classified as a voluntary termination.

(Elliot Dep., Ex. 29.) Thus, violation of this portion of the leave policy is a terminable offense, which means that violation of the policy provides for, but does not require or mandate, immediate termination. Mr. Elliot admits that he sold at least one car while he was on leave from Wal-Mart, and he bought at least three cars during that time. Furthermore, Mr. Elliot assisted in building a portable office building on the premises of his used car lot and unloaded lumber from a truck while on his leave of absence.

On November 2, 2000, Mr. Elliot received a telephone call from Mr. Johnson, who asked him to come into the district office at 9:00 a.m. the following day. When Mr. Elliot arrived on November 3, 2000, Mr. Johnson inquired about the status of Mr. Elliot's foot. According to the defendant, Mr. Johnson asked Mr. Elliot if he could come to work to conduct interviews of potential seasonal associates, and Mr. Elliot responded that he was unable to do so because of the injury to his foot.[4] Mr. Elliot testified that Mr. Johnson informed him that he was being terminated for a conflict of interest between the used car dealership and his employment at Wal-Mart, and he produced an exit interview form with "conflict of interest" checked as the reason for Mr. Elliot's termination. Mr. Elliot told Mr. Johnson that this justification was implausable because Wal-Mart is not in the business of selling cars.[5] Mr. Elliot testified that Mr. Johnson thereupon picked up the exit interview form and left the office for approximately ten minutes.[6] When he returned, he gave Mr. Elliot an exit interview form that indicated that Mr. Elliot was being terminated for "gross misconduct" for working while on a leave of absence, which he considered to be an infraction that called Mr. Elliot's integrity into question. Mr. Elliot refused to sign the exit interview form, and he turned in his discount card and left the store.

Mr. Johnson testified that Wal-Mart allows many disabled employees to work with reasonable accommodations, such as allowing individuals to use scooters in which they can

---

[4] Mr. Elliot does not recall this portion of the conversation. Mr. Johnson indicates that this exchange may have occurred during the November 2, 2000, telephone conversation. (Johnson Dep. at 93.)

[5] Mr. Johnson denies that this exchange occurred, and he also denies that there was an exit interview form with "conflict of interest" checked as the reason for Mr. Elliot's termination.

[6] Mr. Johnson admits that he left the meeting with Mr. Elliot for several minutes to make a telephone call to the regional personnel director.

move around the store. However, there is a specific procedure that employees are required to follow in order to receive a reasonable accommodation; an employee must fill out a request for an accommodation form, which is reviewed by a committee on the corporate level to determine whether the particular accommodation that had been requested would be feasible.

Mr. Elliot filed a charge of discrimination with the EEOC on April 27, 2001. He filed his complaint in the Circuit Court of Walker County, Alabama on November 30, 2001, and the defendant removed the action to this court on January 3, 2002. The complaint states six causes of action: (1) a worker's compensation claim under Alabama law; (2) a claim for retaliatory discharge under Alabama's worker's compensation law; (3) a failure to accommodate claim brought under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA" or "the Act"); (4) an ADA discrimination claim for discriminatory discharge; (5) a claim for intentional infliction of emotional distress under Alabama law; and (6) a claim for negligent infliction of emotional distress under Alabama law.[7] The instant motion for summary judgment as to all the plaintiff's claims was filed on January 31, 2003.

## III.  Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment

---

[7] In their briefs, the parties discussed a claim for retaliatory discharge under the ADA. However, it is clear to the court that the plaintiff has never plead such a claim; therefore, it will not discuss the merits of an ADA retaliation claim that the plaintiff might have, but failed to, state.

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV. Discussion.

### A. Worker's compensation claims.

Although neither party has raised the question of the court's jurisdiction in this matter, it is incumbent upon the court to inquire into the propriety of its jurisdiction in cases where jurisdiction is doubtful. *See Hobbs v. Blue Cross Blue Shield of Ala.*, 276 F.3d 1236,

1240 (11th Cir. 2001); *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409-10 (11th Cir. 1999). While removal of the plaintiff's ADA claims and state law tort claims was proper, *see Reed v. The Heil Co.*, 206 F.3d 1055, 1058 (11th Cir. 2000), claims arising under the worker's compensation laws of the forum state are specifically nonremovable under 28 U.S.C. § 1445(c). The Eleventh Circuit has held that neither direct claims for worker's compensation benefits nor claims for retaliatory discharge under Alabama's worker's compensation law may be removed. *See Reed*, 206 F.3d at 1061. Therefore, the plaintiff's claims under Alabama's worker's compensation law are due to be, and will be, remanded to the state court whence they were improvidently removed. *See id.* ("[W]e conclude that the federal court lacks subject matter jurisdiction to entertain [the plaintiff's] retaliatory discharge claim; it must be remanded to state court.").

**B.     ADA discriminatory discharge and failure to accommodate claims.**

Mr. Elliot claims he was wrongfully discharged in violation of the ADA, which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the . . . discharge of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Furthermore, he claims that Wal-Mart failed to offer him a reasonable accommodation for his alleged disability. *See Lucas v. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). To prevail on a discriminatory discharge theory, Mr. Elliot must establish a prima facie case of disability discrimination by showing: (1) he has a disability, as that term is defined under the ADA; (2) he is qualified to serve in his former position at Wal-Mart, either with or without some reasonable accommodation; and (3) he

has suffered an adverse employment action because of his disability. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1444, 1445 (11th Cir. 1998); *Smith v. Ala Dep't of Corr.*, 145 F. Supp. 2d 1291, 1300-01 (M.D. Ala. 2001). Furthermore, if Mr. Elliot establishes that he is a qualified individual with a disability, he may succeed on his failure to accommodate claim upon a showing that the employer failed to reasonably accommodate his disability. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).

Mr. Elliot must first establish that he suffered from a disability within the meaning of the ADA. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Mr. Elliot claims that he is substantially limited in the major life activities of walking and working, or, in the alternative, that his employer regarded him as being so limited. For an impairment to be substantially limiting, it must "prevent[ ] or severely restrict[ ] the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002). The court is of the opinion that Mr. Elliot's impairment does not substantially limit him in the major life activity of walking or working.

Initially, the court notes that the impact of Mr. Elliot's impairment was neither permanent nor long term; his treating physician opined that his stress fracture would be healed by November 22, 2000, and that he would reach maximum medical improvement by April 24, 2001, at the latest. However, even if the impact of the impairment was long term or permanent in this case, there is no evidence from which a reasonable factfinder could

conclude that Mr. Elliot was severely restricted in his ability to walk. *See, e.g., Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) ("[M]oderate difficulty experienced while walking does not rise to the level of a disability."). At the most, Mr. Elliot experienced discomfort when he walked on concrete floors, and he was advised by his doctors to stay off his feet for several weeks. The fact that his doctors did not prescribe any medication for pain or other symptoms belies any claim that his foot injury caused a substantial limitation in his ability to walk. The court is therefore of the opinion that Mr. Elliot has failed to adduce any evidence that would allow a reasonable factfinder to conclude that he is substantially limited in his ability to walk.

Similarly, Mr. Elliot has not established that he is substantially limited in his ability to work. To establish a substantial limitation in the ability to work, Mr. Elliot must prove that his impairment "generally foreclos[ed] the type of employment involved, not just a narrow range of job tasks." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir. 1996). *See also Stewart*, 117 F.3d at 1285 ("When individuals claim that they are substantially limited in the major life activity of 'working,' their condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'") (citation omitted). Indeed, the employee's "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Gordon*, 100 F.3d at 912. Mr. Elliot alleges that he is prohibited by his impairment from being employed in any position that involves prolonged standing or walking. The court is of the opinion that this evidence falls short of what is necessary to establish a substantial limitation in Mr. Elliot's

ability to perform a broad range of jobs in various classes. Indeed, Mr. Elliot's doctor testified that Mr. Elliot could perform a job that involved walking up to two miles a day, as well as sedentary and partially sedentary jobs. Therefore, Mr. Elliot has not produced evidence from which a reasonable factfinder could conclude that he is substantially limited in his ability to perform one or more major life activities.

Mr. Elliot alleges, in the alternative, that his employer regarded him as substantially limited in his ability to work. To prove that he was regarded as being disabled, Mr. Elliot must show that Wal-Mart mistakenly believed either that he had a physical impairment that substantially limited one or more major life activities, or that an actual, nonlimiting impairment substantially limited one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In either scenario, "it is necessary that [the defendant] entertained misperceptions about the individual . . . . These misperceptions often 'result from stereotypic assumptions not truly indicative of . . . individual ability.'" *Sutton*, 527 U.S. at 489 (quoting 42 U.S.C. § 12101(7)). Mr. Elliot supports his claim that the defendant regarded him as disabled by pointing out that Wal-Mart granted him a medical leave of absence, which, according to Mr. Elliot, means Wal-Mart perceived him as having a disability. Mr. Elliot cites as support *Pritchard v. Southern Co. Services*, 92 F.3d 1130 (11th Cir. 1996), in which the Eleventh Circuit held that summary judgment was improper where the undisputed evidence showed that the plaintiff was on disability leave granted by his employer. The court is of the opinion that this case is distinguishable from *Pritchard* because in this case, Mr. Elliot was not on disability leave; he was on medical leave, which may be granted by Wal-Mart in the absence of a determination that the employee has an

impairment that qualifies as a disability. Evidence that Mr. Elliot was on medical leave, standing alone, does not constitute evidence from which a reasonable factfinder could conclude that Wal-Mart perceived him as being substantially limited in his ability to perform one or more major life activities. Thus, Mr. Elliot cannot establish that he is disabled within the meaning of the ADA, and he is therefore not entitled to the protection of the Act. Accordingly, summary judgment is due to be granted as to his discriminatory discharge and failure to accommodate claims.[8]

## C. State tort claims.

### 1. Intentional infliction of emotional distress.

To establish the tort of intentional infliction of emotional distress, or outrage, the plaintiff must show: (1) that the defendant intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was "extreme and outrageous;" and (3) that the actions of the defendant caused the plaintiff emotional distress so severe that no reasonable person could be expected to endure it. *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981). *See also U.S.A. Oil, Inc. v. Smith*, 415 So. 2d 1098, 1100 (Ala. Civ. App. 1982). The Alabama Supreme Court has defined extreme conduct as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded

---

[8] Furthermore, as to the discriminatory discharge claim, even if Mr. Elliot had established a prima facie case of discrimination, Wal-Mart has come forward with a legitimate, non-discriminatory reason for Mr. Elliot's termination: his violation of the leave of absence policy. *See Wascura*, 257 F.3d at 1242. Mr. Elliot has produced no evidence from which a reasonable factfinder could conclude that the stated reason for his termination is mere pretext for discrimination based on his alleged disability. Therefore, even if he had established a prima facie case, summary judgment would be proper as to the discriminatory discharge claim.

as atrocious and utterly intolerable in a civilized society." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). The tort will not reach conduct that amounts to "mere insults, indignities, threats[, or] annoyances." *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).

The Alabama Supreme Court has maintained that "the tort of outrage is a very limited cause of action, available only in the most egregious circumstances." *Southern Bakeries, Inc. v. Knipp*, No. 1010743, 2002 Ala. Lexis 356, at *12 (Ala. Dec. 13, 2002). Indeed, the court has recognized the tort in only three types of cases: (1) those arising out of wrongful conduct in the family-burial context, (2) those arising out of "barbaric methods employed to coerce an insurance settlement," and (3) those arising out of "egregious sexual harassment." *Potts*, 771 So. 2d at 465.

The court is of the opinion that Wal-Mart's conduct in this case – conducting an investigation into Mr. Elliot's activities at his used car lot during his leave of absence and ultimately terminating his employment – does not constitute extreme and outrageous conduct of the type contemplated by the Alabama Supreme Court in the limited circumstances in which it has recognized a claim for outrage. Furthermore, Mr. Elliot makes no allegations that would lead a reasonable factfinder to conclude that he suffered from emotional distress so severe that no reasonable person could be expected to endure it. Mere conclusory allegations that he suffered humiliation are insufficient to establish that Mr. Elliot suffered emotional distress of the severity required to sustain an intentional infliction of emotional distress claim. Therefore, summary judgment is due to be granted as to this claim.

  2. **Negligent infliction of emotional distress.**

The defendant argues, and the plaintiff concedes, that there is currently no cognizable claim for negligent infliction of emotional distress under Alabama law. *See, e.g., Gideon v. Norfolk Southern Corp.*, 633 So. 2d 453 (Ala. 1994). The court is not inclined to recognize such a cause of action under state law given that the Alabama Supreme Court has heretofore refused to do so. Therefore, summary judgment is due to be granted as to this claim.

**V. Conclusion.**

In sum, the court is without jurisdiction to consider the plaintiff's claims that arise under Alabama's worker's compensation law; those claims are therefore due to be remanded. However, the motion for summary judgment is due to be granted as to the plaintiff's remaining claims. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 3rd of June, 2003.

                L. Scott Coogler
                United States District Judge